654 So.2d 682 (1995)
SUCCESSION OF Hardie ROBINSON.
No. 94-CC-2229.
Supreme Court of Louisiana.
May 22, 1995.
*683 David Gertler, Mike Gertler, Jill D. Trahan, Gertler, Gertler, & Vincent, New Orleans, for applicant.
Brett M. Dupuy, Raymond J. Brandt, Metairie, Timothy Thriffiley, Chalmette, for respondent.
JOHNSON, Justice.[*]
On June 14, 1971, Hardie Robinson, Jr.[1], executed a statutory will in which he formally acknowledged Barbara Ann Lyons, Patricia Marie Lyons, and Hazel Marie Lyons as his daughters.[2] These acknowledged women were born in 1949, 1951, and 1953 respectively. At the time the women were conceived and born, their mother, Hazel Davis Lyons, was married to and living with William Lyons, Sr. Therefore, the women were the legitimate children of William and Hazel Lyons.
On May 18, 1988, Hardie Robinson, Jr., changed the manner in which his assets were to be distributed by executing a new statutory will revoking the 1971 will. The acknowledged women were not mentioned in the 1988 will.[3]
On February 5, 1992, Hardie Robinson, Jr. died. After decedent's death, Melvin Alfred Robinson petitioned to be appointed the succession administrator claiming that he was Hardie Robinson, Jr.'s only legitimate child and sole heir. Melvin Robinson was confirmed as administrator. Thereafter, the acknowledged women intervened in the succession seeking, among other things, to be recognized by the court as the formally acknowledged children of decedent based on the 1971 will and, as such, to participate in decedent's succession as forced heirs. The trial court found that the 1971 will executed by decedent was an acknowledgment by Hardie Robinson, Jr. of his daughters.
In response, pursuant to La.R.S. 9:396, Melvin Robinson filed a motion to compel genetic testing through performing blood tests on the acknowledged women and their mother "to determine what relationship, if any, the purported heirs have to decedent." The trial court denied the motion stating that "[g]enetic testing has no relevance to the issue of whether or not [the women] have been acknowledged." The court of appeal set aside the trial court's judgment and remanded the matter for a hearing "to determine whether DNA testing ... should be ordered [reasoning that decedent] could not validly acknowledge [the women] if they were not his children." The court of appeal found that DNA testing was relevant and that La. R.S. 9:396 would authorize the blood testing. On the intervenors' application, we granted certiorari to determine the correctness of that ruling.
The issue presented for our review is whether, in a succession proceeding, a court can compel formally acknowledged illegitimate persons and their mother to submit to blood tests.
In resolving this issue, we must first determine whether, under the circumstances, authority exists for ordering the requested blood tests. If so, whether competing constitutional interests weigh in favor of permitting *684 such testing. Finally, if testing is permissible in this case, whether procedural safeguards are necessary to protect the constitutional rights implicated.
La.R.S. 9:396 A, a statute directed at establishing paternity, provides:
Notwithstanding any other provision of law to the contrary, in any civil action in which paternity is a relevant fact, or in an action en desaveu, the court, upon its own initiative or upon request made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to the drawing of blood samples and shall direct that inherited characteristics in the samples, including but not limited to blood and tissue type, be determined by appropriate testing procedure. If any party refuses to submit to such tests, the court may resolve the question of paternity against such party or enforce its order if the rights of others and the interests of justice so require.
The statute authorizes blood testing of the mother and child in cases where paternity is relevant. Moreover, the general rules of discovery may authorize blood tests where such tests are likely to produce relevant evidence. Sudwischer v. Estate of Hoffpauir, 589 So.2d 474 (La.1991); La.Code Civ.P. art. 1422.[4]
Thus, our inquiry is narrowed. We must determine whether Hardie Robinson, Jr.'s biological relationship to the intervenors is relevant to the legal effect to be given the formal acknowledgment in this succession proceeding. That is, whether the validity of the formal acknowledgment depends upon whether decedent was the intervenor's biological father.
La.Civ.Code art. 178 states that children are either legitimate or illegitimate. Legitimate children are defined by La.Civ.Code art. 179 as those who are either born or conceived during marriage or who have been legitimated in the manner provided by law. La.Civ.Code art. 180 states that illegitimate children are those who are conceived and born out of marriage. Under La.Civ.Code art. 203, an illegitimate child is acknowledged by a declaration executed before a notary public, in the presence of two witnesses, by the "mother" or "father." Although art. 203 does not expressly preclude executing an acknowledgment where no biological relationship exists, this conclusion is self-evident and definitional of an acknowledgment. An acknowledgment is an avowal emanating from the "mother" or "father" to establish maternal or paternal filiation. 1 M. Planiol, Treatise on the Civil Law § 1476 (La.St.L.Inst. transl. 1959). The word "filiation" describes the fact of biological parentage. La.Civ.Code arts. 193-197. Thus, through the acknowledgment, the "mother" or "father" provides proof of maternal or paternal filiation, that is, biological parentage. Absent a biological relationship, the avowal is null. "A fact cannot be avowed when it has never existed." 1 Planiol, supra, § 1490(2). If the acknowledgment is null, it produces no effects.
Our conclusion, that the validity of an acknowledgment may depend on the existence of a biological relationship is in line with other decisions addressing this issue. Specifically, in McKinley v. McKinley, 631 So.2d 45 (La.App. 2nd Cir.1994), Paul McKinley married Wendy McKinley six weeks after she gave birth to Justin McKinley. Paul and Wendy McKinley knew that Paul was not Justin's biological father because Justin was conceived before they began dating. Nonetheless, after their marriage, Paul and Wendy executed an authentic act avowing that Paul was Justin's father. Sometime thereafter, Paul and Wendy divorced. Wendy sought to terminate Paul's parental rights asserting that Paul was not the biological nor legal father. Although custody of Justin was awarded to Paul based on the child's best interest test, the Second Circuit found that "[o]nly a father may formally acknowledge an illegitimate child...." Id. at 48. The court concluded that the acknowledgment was *685 without legal effect. Similarly, courts in France have permitted legal attacks against false formal acknowledgments. As discussed in 1 Planiol, supra, § 1490(2),
A very young man, just out of college, made the acquaintance of a woman who had a child then four years old. Through weakness he acknowledged that he was the father of the child, born several years before he had met its mother. The Lyons Court of Appeals held that his suit to attack this acknowledgment was [permissible].
(citing Lyons, March 13, 1856, D. 56. 2. 232, S 56 2. 586; Seine, June 28, 1932, Gazette du Palais, Oct. 10).
Our inquiry regarding the relevance of a biological relationship is not ended merely by the possibility that the formal acknowledgment is false. The form of the acknowledgment and the admissibility of evidence to attack the acknowledgment must also be considered.
A formal acknowledgment executed before a notary and two witnesses is an authentic act. La.Civ.Code art. 1833.[5] "An authentic act constitutes full proof of the agreement it contains, as against the parties, their heirs, and successors by universal or particular title." La.Civ.Code art. 1835. Consequently, parole evidence is rarely admissible to contradict or destroy the authentic act. Casenotes, Civil Law: Parole Evidence to Vary an Authentic Act, 27 Loy. L.Rev. 719 (1970-71). However, where it is alleged that the act is made in contravention to the law, evidence relevant to this fact is admissible to prove what legal effect, if any, the act will be given. Succession of Fletcher, 11 La.Ann. 59 (La.1856).
The information sought through blood tests would produce evidence relevant to paternal filiation. In facilitating a determination of paternity, blood tests are highly reliable and unequaled in evidentiary value. In re J.M., 590 So.2d 565 (La.1991). In fact, this court has previously recognized the great evidentiary value provided by a blood test exclusion of paternity. Id.; Sudwischer; Pace. Additionally, blood tests may even aid in resolving paternity issues posthumously. Pace v. Louisiana, 94-1027, p. 12, 648 So.2d 1302 (La.1995). Relevance is extant.
Here, Hardie Robinson, Jr. formally acknowledged the intervenors in the 1971 will executed before a notary public and two witnesses. The acknowledgment complies with the formal requisites contained in art. 203 and is an authentic act. If a biological relationship did not exist between decedent and the intervenors, then the acknowledgment was made in contravention of the law, particularly, the substantive requirements of art. 203. Accordingly, evidence of paternity is germane to the issue of the validity of the acknowledgment.
The right to challenge the acknowledgment is granted in La.Civ.Code art. 207 which provides that "[e]very claim, set up by illegitimate children, may be contested by those who have any interest therein." As administrator of the succession and a forced heir, Melvin Robinson has an interest in defeating the intervenors claim to participate as forced heirs in the decedent's succession.
Although the information sought is relevant, its production involves a balancing of competing constitutional interests. Specifically, Melvin Robinson's interest in discovering data obtainable through blood tests and the state's interest in forcing the acknowledged women and their mother to submit to a blood test versus the acknowledged women and their mother's privacy interests.
In Succession of Lauga, 624 So.2d 1156, 1158 (La.1993), this court stated that "Article XII, § 5 guarantees the individual right of a child to an equal share of a forced portion of his or her decedent's estate and maintains the correlative public principle of equality of heirship, which furthers the goals of dispersion of wealth, family solidarity, and reduction of litigation." Forced heirship is an individual constitutional right, not merely a *686 statutory entitlement. Id. Nonetheless, the forced portion is determined by statute. If Melvin Robinson is decedent's sole forced heir, then he is entitled to inherit one-fourth of the decedent's estate. La.Civ.Code art. 1493. If only one acknowledged daughter is a forced heir, then Melvin Robinson's inheritance would remain unchanged. Id. However, if two or more of the acknowledged women are forced heirs, then Melvin Robinson will only inherit his share of one-half of the decedent's estate. Id. This would greatly reduce Melvin Robinson's legitime. Obviously, Melvin Robinson has a financial interest in determining whether the decedent was the acknowledged women's biological father.
Additionally, forced heirship furthers important state interests. The purpose of forced heirship is to further the state's interest in the prevention of excessive concentrations of wealth and the promotion of family harmony and solidarity through deterrence of intra-family discord and litigation. Forced heirship was designed to avoid family disharmony and litigation among siblings and the concentration of family estates in fewer than all the children, to the economic detriment of society and the resulting impoverishment of the disinherited children. Succession of Lauga, 624 So.2d 1156 (La.1993). "Because of the unique nature of Louisiana succession law, which constitutionally requires forced heirship (La. Const. art. XII, § 5), a testator is not free to bequeath all his property to whomever he pleases if he leaves descendants." Thus, the state has an interest in preventing parents from circumventing a child's constitutional right as a forced heir. By acknowledging persons with whom no biological relationship exists, a parent could greatly reduce a forced heir's legitime and undermine forced heirship laws. Consequently, the state has a compelling interest in ordering the intervenors to submit to blood tests to determine the validity of the acknowledgment.
On the other hand, the acknowledged women and their mother have constitutional privacy and due process rights which protect includes the right to avoid disclosure of personal matters and the interest in independently making certain kinds of important decisions. Whalen v. Roe, 429 U.S. 589, 599-600, 97 S.Ct. 869, 876-77, 51 L.Ed.2d 64 (1977). In In re J.M., 590 So.2d at 567, this court recognized that a "blood test is minimally intrusive, relatively painless, and medically safe." The results of the blood tests will disclose limited information relevant to whether a biological relationship exists between the decedent and the acknowledged women. The women are the legitimate children of William Lyons, Sr. The women have not alleged that they enjoyed a father/daughter relationship with Hardie Robinson, Jr. At issue is the creation of one parent-child relationship and the questioning of another. The acknowledged women and their mother have not claimed the existence of any obstacle or burden in submitting to blood tests. See Sudwischer, 589 So.2d at 476. Based on the foregoing, we find that the invasion of privacy exists, but it is limited. To avoid the invasion, the intervenors have the option of acquiescing the lack of a biological relationship with the decedent. See Sudwischer, 589 So.2d at 476.
In balancing the state's compelling interest in protecting the constitutionally guaranteed right of forced heirship against the limited invasion of privacy, we find that the latter must fail.
Finally, the invasion of privacy involved, compelled submission to a blood test, implicates an individual's constitutional right to due process. In re J.M., 590 So.2d at 569. Consequently, procedural safeguards are necessary to afford due process before blood tests can be compelled by a court order. The factors to consider in determining what procedural protections are required are: (1) the privacy interests affected by ordering the blood test, (2) the risk of erroneous deprivation of the privacy interest, and (3) the governmental interests implicated. Id. (quoting Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).
First, as previously discussed, the privacy interests are limited. Blood tests are minimally intrusive and the results will be used solely to determine the existence of a biological relationship with decedent.
Second, we must consider the risk of erroneous deprivation of the intervenors' and *687 their mother's constitutional interests. The risk of erroneous deprivation is great if a peremptory order for blood tests is issued. However, the risk is substantially reduced if the moving party, here, Melvin Robinson, is required to establish a prima facie showing of the reasonable possibility of a lack of filiation before obtaining the requested order.
Third, as previously discussed, the state's interest in requiring compliance with the substantive requirements of La.Civ.Code art. 203 as it relates to the state's interest in preventing circumvention of forced heirship is compelling. Additionally, the state should not incur a financial burden in requiring such testing upon a proper showing because the private litigants will pay for the testing. Accordingly, we conclude that before the trial court can order blood tests of the acknowledged women and their mother, we require the mover, Melvin Robinson, to make a prima facie showing, on a rule to show cause, of the reasonable possibility of a lack of paternity.
For the reasons assigned, the judgment of the court of appeal is affirmed insofar as it ordered a hearing to determine whether blood tests of the intervenors and their mother should be ordered. The case is remanded to the trial court to conduct a hearing and further proceedings consistent with this opinion.
KIMBALL, J., not on panel. Rule IV, Part 2, § 3.
CALOGERO, C.J., assigns additional concurring reasons.
CALOGERO, Chief Justice, concurring.
Although the majority opinion does not address the revocation issue directly, I concur to make clear that while the revocation of a will may change the order of disposition of the decedent's estate, it does not eradicate an acknowledgement made by an authentic act before a notary and two witnesses contained in the prior will which was revoked by a subsequent will.
NOTES
[*] Judge Charles R. Lindsay, Court of Appeal, Second Circuit, participating as associate Justice Pro Tempore, in place of Justice James L. Dennis.

Kimball, J., not on panel. Rule IV, § 3.
[1] According to decedent's 1971 will, 1988 will, and the certificate of death, decedent's proper name was Hardie Robinson, Jr.
[2] The 1971 will provided in pertinent part as follows:

I, HARDIE ROBINSON, JR., make this my last will and testament, revoking all others.
I leave and bequeath to my daughters BARBARA ANN LYONS, HAZEL MARIE LYONS, AND PATRICIA MARIE LYONS, the sum of Fifteen Thousand & 00/100 ($15,000.00) Dollars, to be divided among them equally.
I leave and bequeath the residue of my estate of all property I may die possessed of both real and personal to my son, MELVIN ALFRED ROBINSON.
[3] The 1988 will provided in pertinent part as follows:

I, Mr. Hardie Robinson, Jr., do make this my last will and testament, revoking any and all wills made prior hereto.
At the time of my death, I give all I own to my wife, Mrs. Mary F. Robinson.
[4] La.Code Civ.P. art. 1422 provides in pertinent part:

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party....
[5] La.Civ.Code art. 1833 provides in pertinent part:

An authentic act is a writing executed before a notary public or other officer authorized to perform that function, in the presence of two witnesses and signed by each party who executed it, by each witness, and by each notary public before whom it was executed.