JiMURRAY, Judge.
This ease presents a question that does not appear to have been addressed by the Louisiana Children’s Code or any reported case. That is, whether an alleged father, who has been served with Notice of Filing of Surrender, has the right to genetic testing to establish a biological link prior to attempting to demonstrate his commitment to establish a parental relationship pursuant to La.Ch.C. art. 1132. The Juvenile Court herein entered an order refusing to terminate the alleged father’s parental rights, and ordering that paternity testing be performed; Associated Catholic Charities appeals that judgment. We affirm.[1]

JaFACTS AND PROCEDURAL HISTORY:

On June 22, 1996, N.M.L.[2] (Mother), a 14 year old, gave birth to a baby girl (Baby). She identified D.F., Jr. (Jr.), a 15 year old, as Baby’s father. On July 12, 1996, Mother surrendered Baby to Associated Catholic Charities (ACC) for adoption. An executed Voluntary Act of Surrender for Adoption and supporting documentation was filed with the Juvenile Court on July 15. The following day Juvenile Court issued a subpoena directed to Jr. to be served with a copy of a Notice of Filing of Surrender, which was in the form provided in La.Ch.C. art. 1132. The record[3] shows that service was not made because “subject does not reside at this address.”[4] On July 22, 1996, ACC placed Baby with foster-adoptive parents. On August 12,1996, ACC moved to have a curator appointed to locate Jr., as required by La.Ch.C. art. 1136.
The curator had an advertisement published in the personals section of the Times Picayune on September 27, 28 and 29, 1996. On October 4, in response to that ad, she was contacted by D.F., Sr. (Grandfather), who advised her that the person she was attempting to contact was his son. Grandfather explained that he and his wife were separated, and that Jr. lived with his wife. He then gave his wife’s address and telephone number to the curator.[5] The curator called the telephone number several times without reaching anyone. She finally spoke to the ^alleged father’s mother (Grandmother) on the evening of October 4. Grandmother refused to call Jr., who was asleep, to the phone. The curator attempted to reach Jr. several more times, without success. On October 10 she contacted Grandfather again, and he gave her the number for a telephone in his son’s room. The curator eventually reached Jr. later that day. She advised that she would be sending a registered letter to him, and explained the importance of his accepting and signing for that letter. On October 11, the curator mailed a letter and a copy of the Notice of Filing of Surrender to Jr. This letter advised Jr. that:
“The enclosed notice gives you specific instructions as to what to do, whether you *1355 want the baby or not. I would advise you to mail something to:
Mrs. Butler
Adoption Clerk
Orleans Parish Juvenile Court
421 Loyola Ave.
New Orleans, LA 70112
This would protect your rights no matter what you eventually decide.” (emphasis added)
The curator also sent copies of the letter and enclosure to Grandmother. Both communications were sent by certified mail; return receipts were requested. “D.F.” signed as receiving both pieces of mail on October 18, and the receipts were returned to the curator on October 19.[6] On November 12, the curator filed a Note of Evidence in the record.
ACC filed a Motion to Terminate Parental Rights on November 20, 1996, and a Rule to Show Cause on the motion was set for December 9, 1996. The record includes a copy of the Motion to Terminate that was sent by certified mail 14to “Mr. D.F.” at Jr.’s address, but returned by the post office as “unclaimed” on December 12, 1996. Based on representations made during oral argument, it appears that domiciliary service of the Motion and attachments was made by the Civil Sheriff on December 2,1996.
Jr., Grandfather and Grandmother appeared on December 9, without counsel. Jr. was sworn and testified that he had received a notice in the mail telling him that the surrender had been filed, and advising him of the time within which to request a hearing. The court confirmed that the return receipt for that notice had been received. The court then questioned Grandmother, who advised that she had responded to the curator’s letter by writing to the address contained therein requesting a paternity test. When she got no response to her letter she called Juvenile Court and spoke to Ms. Butler, the Adoption Clerk. She stated that Ms. Butler told her that she would call the attorney at ACC, who would respond to her.[7]
Ms. Butler denied receiving a letter from Grandmother, but admitted that she called and asked why she had not heard from the court in answer to her letter. When asked by the court if she recalled the date of the telephone call, Ms. Butler responded, “It should be marked in there, because I noted it.” There was no further questioning in this regard.[8]
Grandmother told the court that she and her husband had no knowledge of the baby until they spoke to the curator on the phone. In response to the court’s questions about why no effort had been made to contact Mother or develop any ^relationship with Baby, Grandmother responded that they had discussed the matter and could not decide what to do. They ultimately decided to request testing to confirm that Jr. was the child’s father. They did not seek legal counsel. Grandmother advised the court that her son would oppose the adoption if it was determined that he was Baby’s father. When asked by the court if Jr. was in a position to raise a child, Grandmother stated, “Definitely, with my help. He is not in a position to do this. It would be mine and [D.F.] Sr.’s responsibility.”
Following this exchange, the court advised the attorney for ACC that the opposition had put it in an “iffy” position. For this reason, the court inquired if ACC was interested in having paternity determined, despite the delay. Counsel advised that the agency wished to proceed with the termination. The court *1356 then noted that it would be necessary “to take testimony under oath as to what was received and so forth.”[9] Because Grandmother advised that Jr. did not wish to proceed without counsel, the court continued the hearing.
On January 16, 1997, Jr., through his parents, filed an objection to the motion to terminate his parental rights. The matter was argued on January 23, 1997. Counsel for ACC introduced evidence of its compliance with the adoption articles of the Children’s Code. No testimony was taken. Following argument by counsel for both parties, the court denied ACC’s Motion to Terminate, noting it had reviewed the transcript from December 9. The court indicated that the fact that the alleged father was a minor must be considered. The court reviewed the evidence that tended to establish that a letter requesting paternity testing had been sent to Juvenile Court upon receipt of the Notice of Filing of Surrender. Although it acknowledged that “we are beyond all the time frames,” the court ordered the letesting, at the expense of Jr.’s parents. ACC strenuously objected to the blood testing. At its request, the court stayed the portion of its order relating to conducting blood tests, pending this court’s ruling on the termination issue.

DISCUSSION:

ACC contends that the lower court erred in ordering a blood test to determine paternity and denying its motion to terminate. It argues that Jr. was given notice and an .. opportunity to object to the termination, but did not do so timely. It also argues that Jr.’s parents have no standing to request blood testing to establish paternity. Counsel for Jr. counters that Jr., a minor, is without legal capacity to surrender his parental rights,, so that ACC could only terminate his rights through his parents. He also argues that Jr., through his parents, was entitled to determine if he is Baby’s biological father before attempting to exercise his parental rights.
We first address the argument that a minor can only surrender his parental rights with his parents’ consent. Title X of the Children’s Code deals with the involuntary termination of parental rights. Article 1005 provides that “[A]ny parent may be subject to proceedings under this Title and shall have juridical capacity for such proceedings, regardless of age or matrimonial status.” (emphasis added).[10] Thus, contrary to the arguments of counsel for Jr., the Code specifically provides for a minor’s juridical capacity with regard to the termination of his parental rights.[11]
|7ACC contends that Jr. could oppose the termination or adoption only if he filed an opposition in the Juvenile Court record within fifteen days from October 18, 1996, the date on which he received notice that the surrender had been filed. Because no pleading opposing the termination of parental rights was filed in the record until January 16, 1997, ACC argues that Jr. is precluded from objecting to the termination of his rights or opposing the adoption.
The court below found that Jr. was entitled to determine paternity prior to attempting to demonstrate his fitness and commitment to assuming parental responsibility. The court apparently concluded that Jr., by requesting blood testing to determine if he had a biological link to Baby, had preserved his right to object to the adoption, if that biological link exists.
*1357 In denying the motion to terminate, the court noted that Grandmother stated that upon receipt of the curator’s letter she sent a ■written request for blood testing to determine paternity to Juvenije Court. Grandmother stated that Jr. would oppose the adoption if Baby were determined to be his child. Although the . alleged letter had not been received by the Adoption Clerk, and no copy was offered at the hearing, the court apparently concluded that it was sent in accordance with the curator’s instructions, as Grandmother had represented.
An appellate court may not set aside a trial court’s factual findings absent manifest error. Maranto v. Goodyear Tire & Rubber Co., No. 94-2603, p. 7 (La.02/20/95), 650 So.2d 757, 762. In Mart v. Hill, 505 So.2d 1120 (La.1987), the Court reiterated the two-part test for reversing a factfinder’s determination on appellate review: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court; and 2) the appellate court must further determine that the record establishes that the finding |⅛ clearly wrong. See also Stobart v. Dep’t. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). The testimony of Grandmother and the Adoption Clerk provide a reasonable basis for the court’s conclusion that a timely written request for paternity testing had been made, particularly in light of the curator’s instructions in the letter of October 10.[12]
We must next consider whether a letter requesting that a biological link be established between the alleged father and the child is sufficient to preserve Jr.’s constitutionally protected interest in his opportunity to develop a mutually beneficial emotional bond with his child.
ACC argues that there is no legal authority or justification for requiring a blood test to determine paternity when there has been no showing, as required by Article 1137 of the Children’s Code, that the alleged father has made affirmative efforts to establish or maintain a parental relationship with the child. Although it acknowledges that La.Rev.Stat.Ann. 9:396 affords Jr. the right to request testing to determine paternity, ACC argues that this right is limited by the requirement that an alleged father object to termination or oppose the adoption.
This argument ignores the fact that a biological link, though by itself insufficient' to preserve an interest in the opportunity for a parental relationship, is an essential element of that right. Both the United States and Louisiana Supreme Courts have recognized the significance of the biological link.
The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship. If he grasps that opportunity and accepts some | ¡¡measure of responsibility for the child’s future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child’s development.
In Re: B.G.S., 556 So.2d 545, 555 (La.1990), quoting Lehr v. Robertson, 463 U.S. 248, 261-62, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983). A biological parent has a liberty interest in having a relationship with his children that is worthy of constitutional protection. The corollary of a parent’s natural right to its biological child, is the child’s right to its parent. See Id. at 555. “In the absence of a statute, the natural right of a parent to his child requires that his consent must be obtained before his parental rights and duties may be terminated and reestablished in adoptive parents.” Id. at 548 (citations omitted).
Jr. has no right to parent Baby if she is not his biological child. The actions *1358 listed in La.Ch.C. art. 1132 do not create the biological relationship. Rather, they are ways in which a man who is a biological parent may demonstrate his commitment to assume parental responsibility so as to prevent the termination of his parental rights. This court has recognized that the acknowledgment of an individual by a person other than a biological parent does not establish paternity. O’Brien v. O’Brien, 94-1988 (La. App. 4th Cir. 4/13/95), 653 So.2d 1364; see also, McKinley v. McKinley, 631 So.2d 45, 48 (La.App. 2d Cir.1994). Acts' of acknowledgment, either formal or informal, provide proof of filiation, or biological parentage. Succession of Robinson, 94—2229, p. 4 (La.05/22/95), 654 So.2d 682, 684. Without a biological relationship an acknowledgment is null because “[a] fact cannot be avowed when it has never existed.” Id. Article 1137 A of the Children’s Code, which provides a mechanism for “an alleged father to oppose the adoption of his child,” implicitly recognizes this fact.
I ipThe trial court recognized that the failure to provide for a process to determine paternity in connection with the procedures outlined in La.Ch.C. art. 1132 appears to be a shortcoming of the Children’s Code. Were we to ignore this shortcoming, and adopt the position of ACC, we would force an alleged father to acknowledge a child whose paternity he questions in order to preserve his right to oppose his child’s adoption. The consequences of forcing an acknowledgment by a man who later learns that he is not the child’s biological father presents the potential for significant problems. Because acknowledgment by one who is not the biological father is without legal effect, the consequences for a child such as Baby are horrendous. This potential danger far outweighs the uncertainty for the limited period of time it would take to determine if the alleged father, in fact, is the biological father.
There is, and must be, a balancing of the competing interests in this type of situation. By allowing an alleged father to determine paternity by requesting same within the time delay provided by La.Ch.C. art. 1132, before attempting to demonstrate his fitness and commitment to assume parental responsibilities, we maintain the balance between the state’s interest in placing children for adoption and the right of a biological parent and its child to have a relationship.
ACC has pointed out that Baby has now been in the foster-adoptive family’s home for eight months, and her status is still not settled. We recognize that it is in Baby’s best interest to have her status resolved as expeditiously as possible. This matter has been delayed unnecessarily, but not all of that delay can be attributed to Jr. For example, had ACC agreed to paternity testing at the December 9 hearing Jr. would now know if he is Baby’s biological father. Had he been determined to be Baby’s father he would have had to oppose the adoption | nand demonstrate his fitness and commitment to assume his parental responsibility or lose his rights. If he were not the father he would have no rights to be terminated, and ACC could proceed with its efforts on Baby’s behalf.
We therefore affirm the Juvenile Court judgment, and remand for further proceedings. We also order that testing to determine paternity be completed as expeditiously as possible. If it is determined that Jr. is Baby’s biological father, he shall have fifteen days from receipt of notice of that fact to oppose termination of his parental rights as outlined in La.Ch.Code art. 1132.[13]
AFFIRMED WITH ORDER.
BARRY, J., dissents with reasons.
JONES, J., concurs with reasons.

. This matter was docketed as an appeal, and handled under the expedited procedure set forth in La.Ch.C. art. 1143. The trial court was unclear as to'whether this matter was appealable or reviewable only by application for supervisory writs. The judgment of January 23, 1997, is interlocutory. We, therefore, convert this appeal to a timely filed writ application.

. Initiáls and generic identifying terms have been used to protect the parties' identities.

. References to the "record” are to the record as provided to this Court. However, what we have been provided is not complete. For instance, the parties advised that domiciliary service of the Rule to Show Cause set for December 9, 1996, was made on December 2, as confirmed by the Civil Sheriff. However, there is no request for said service or return in the record provided to us.

. The record also includes a subpoena request form indicating that service should be attempted by certified mail, but it contains no dated certified mail receipt or return receipt.

. The address provided is the address that had been provided by Mother, at which the Civil Sheriff had attempted to serve notice.

.The return receipt indicates that the curator did not request that delivery be restricted. In the Note of Evidence the curator represents that the alleged father picked up both letters. However, ACC states that Grandfather signed the receipts. The signature on the receipts does not indicates whether the party who signed was D.F., Jr. or D.F., Sr.

. Although Grandmother and Ms. Butler were questioned by the court, the record does not indicate that either was given an oath.

. The record does not indicate to what "there” referred, nor is there anything in the record that indicates the date of the phone call.

. No additional testimony was taken at that time or at the hearing on January 23, 1997.

. Art. 1102 of Title XI provides that "[e]xcept as otherwise specified in this Title, all provisions of the Children’s Code remain applicable." Thus, the provisions of Art. 1005 of Title X are applicable to Title XI.

.Counsel for Jr. is correct that art. 1113 provides that, as a general rule, a minor cannot execute a surrender unless his parents join in the surrender. However, section E of that article creates an exception to that rule by allowing a minor to surrender to an agency without parental consent. ACC is an agency as defined in La.Ch.C. art 1003.

. ACC argues that the trial court acknowledged that no timely request had been made when it stated at the January hearing that "we are beyond all time frames." However, it appears more likely that this comment was in reference to January 23, the date of the hearing. If ACC’s interpretation were correct the court would have granted the motion, as it seemed inclined to do on December 9. Instead, after reviewing the earlier testimony, the court apparently concluded that a request, within the appropriate time frame, had been made.

. If Jr. objects to the adoption, he must reimburse ACC for all medical expenses incurred by Mother and Baby in connection with Baby’s birth. La.Ch.C. art. 1138 C.